UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| THOMAS BERGSTROM, | ) | CIV.  07-5032-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING |
| | ) | DECISION OF COMMISSIONER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Thomas Bergstrom, alleges that the Commissioner failed to develop the record fully and fairly with respect to Bergstrom's depression, and thus improperly denied Bergstrom disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act.  This court affirms the Commissioner's decision.

**FACTS**

Thomas Bergstrom was 33 years old at the time of the alleged onset of disability, and 37 years old on the date of the Commissioner's final decision. (AR 91, 462)  Despite a learning disability and borderline intelligence, Bergstrom has a high school education after completing course work through special education classes.  (AR 111)  His work experience consists of heavy labor in the logging, carpentry, and oil industries.  (AR 104, 113-24, 168, 339)

Bergstrom alleges disability since April 1, 2002, due to osteoarthritis and depression.  (AR 103, 104)  Bergstrom's record indicates a history of treatment for both ailments.  Mark Heine, a physician's assistant at Queen City Medical Center, examined Bergstrom on November 19, 2001, for complaints of insomnia and neck pain.  (AR 2201-21)  Examination revealed some cervical limitation of motion, and Heine prescribed a two-week supply of antidepressant medication.  (AR 221)

When treating orthopedist Harry C. Stearns, III, M.D., examined Bergstrom on November 20, 2001, and December 19, 2001, Dr. Stearns indicated that Bergstrom did not have work-related restrictions (AR 431).  Dr. Stearns examined Bergstrom on July 17, 2002, noting "no change in [Bergstrom's] left knee" and that Bergstrom could perform work as a finish carpenter or in an auto parts store.  On July 29, 2002, Dr. Stearns stated that Bergstrom could work if he did not have to lift or carry over fifty pounds. Dr. Stearns also noted that Bergstrom should avoid squatting and unprotected heights, such as on roofs or ladders (AR 314, 316, 430). Bergstrom returned to Dr. Stearns on September 4, 2002, with complaints of redness, swelling, and tenderness of his right wrist, and Dr. Stearns repeated the functional restrictions that he recommended on July 29, 2002. (AR 313, 315).

Bergstrom complained of depression when he was treated at the Queen City Medical Center on September 13, 2002.  His affect was characterized as "mood congruent," and no abnormalities of speech, mentation, insight, grooming, hygiene, alertness, or orientation were noted.  (AR 219)  When Mark Perrenoud, Ph.D., examined Bergstrom on October 15 and 17, 2002, Bergstrom described his mood as mildly depressed, and that antidepressants helped.  Dr. Perrenoud believed Bergstrom would likely do well in tasks requiring fine motor skills, such as electronics assembly.  He recommended that Bergstrom continue antidepressant medication and consider counseling for depression, dependency, and stress management.  (AR 312, 441)

On November 15, 2002, S. Richard Gunn, Ph.D., completed psychiatric review technique and mental residual functional capacity (RFC) forms at the Commissioner's request.[1]  (AR 356-73)  Dr. Gunn concluded that Bergstrom had severe mental impairments that resulted in moderate limitations in his ability to maintain attention and concentration for extended periods, but that Bergstrom could perform "routine unskilled work."  (AR 356, 370, 372)

On November 25, 2002, Thomas J. Groeger, M.D., saw Bergstrom, who primarily complained of depression and requested a new antidepressant prescription.  Bergstrom stated that medication controlled his depression,

---

[1] Bergstrom had filed applications for disability, which the Commissioner initially denied on December 12, 2002.  Bergstrom did not appeal those determinations. (AR 16)

although he found the medication soporific.  Dr. Groeger gave Bergstrom

samples of antidepressant medication.  (AR 223)

On November 26, 2002, Kurt A. Stone, M.D., examined Bergstrom at

the request of the Commissioner.  (AR 443-47, 449-51)  Bergstrom informed

Dr. Stone that he could stoop and pick up twenty pounds, walk

approximately one mile, stoop up to four to six hours per day, sit for

prolonged periods, and stand for up to two hours if he could shift and move

around.  (AR 443, 449)  Bergstrom was taking medication for his joints and

depression.  He smoked a pack of cigarettes per day.  Dr. Stone observed that

Bergstrom's affect was flat and somewhat anxious.  Bergstrom complained of

tenderness of the right shoulder, knees, left ankle, and neck; limited motion

in the left knee and back; and weakness of the left quadriceps.  (AR 444-45,

450-51)  Although Bergstrom claimed that he could only extend the left knee

ten degrees, Bergstrom actually could extend the knee fully when Dr. Stone

tested Bergstrom's lumbar flexion.  (AR 445, 451)  Dr. Stone believed

Bergstrom could walk one mile; engage in light duty work with minimal

stooping and bending at the knees; lift twenty pounds; sit one to two hours;

stand one to two hours with some minimal movement; and use his hands

normally.  In Dr. Stone's opinion, Bergstrom should not walk up and down

steps or ladders, or enter and exit heavy equipment.  (AR 445, 451)

4

On December 10, 2002, F.R. Entwistle, M.D., reviewed Bergstrom's records at the Commissioner's request and completed a physical residual functional capacity form.  (AR 374-81)  Bergstrom was diagnosed with mild degenerative joint disease of the left knee and degenerative disc disease of the cervical spine.  (AR 374)  Dr. Entwistle believed Bergstrom could perform the exertional requirements of light work; frequently balance, stoop, and crouch; occasionally climb ramps and stairs, kneel, and crawl; and never climb ladders, ropes, and scaffolds.  (AR 375-376)  Dr. Entwistle did not note any manipulative, visual, communicative, or environmental limitations.  (AR 377-78)

On February 6, 2003, Karen Tjaden, M.D., gave Bergstrom a one-week supply of antidepressants.  On May 29, 2003, Dr. Groeger's clinic gave Bergstrom a two-month supply of antidepressants.

On November 11, 2003, Bergstrom visited Behavior Management Systems for relationship problems with his girlfriend.  (AR 227-36, 320-23)  Bergstrom self-reported that he was on antidepressant medication.  (AR 236)  Intern Bonnie Crawford described Bergstrom's affect as "blunted," but she did not note any other mental status abnormalities.  (AR 231-32)  Crawford estimated Bergstrom's Global Assessment of Functioning (GAF) at 60, or moderate symptoms, and she told Bergstrom to continue his antidepressant medication.  (AR 232)

From June 2003 through June 2004, Bergstrom remained self-employed as a logger. (AR 113) Reports show that Bergstrom earned $5,841.81 in 2003 and $1,754 in 2004. (AR 75, 82) In July 2004, Bergstrom worked in maintenance but left after one month for a higher paying job. (AR 127)

On July 28, 2004, S.A. Giuseffi, M.D., examined Bergstrom for complaints of left foot and ankle pain. Dr. Giuseffi only noted that Bergstrom had tenderness in the left foot arch, and a grating sensation upon movement of the left knee. (AR 238) X-rays of the left foot and ankle returned negative. (AR 238, 240) Dr. Giuseffi recommended that Bergstrom visit a podiatrist and wrap his foot and ankle before work. (AR 238)

On July 30, 2004, podiatrist Carolyn K. Stansberry, D.P.M., reported that Bergstrom's left ankle findings were consistent with an ankle sprain and tendinitis. (AR 244) She indicated that Bergstrom would experience less ankle and knee pain if he sat at a job without standing or lifting. (AR 245) Dr. Stansberry gave Bergstrom a cam walker to immobilize his ankle on August 24, 2004. (AR 243)

Bergstrom visited Jon Wingert, M.D., at the Rapid City Community Health Center on September 29, 2004. Bergstrom was not taking his antidepressant medication, and he complained primarily of migratory arthralgias (joint pain). He still smoked one pack of cigarettes per day.

Dr. Wingert examined multiple joints, but he did not find any joint inflammation or abnormalities.  (AR 265)  He prescribed Celebrex for Bergstrom's joints and ordered multiple tests.  Although he thought Bergstrom might have underlying depression, Dr. Wingert opted not to prescribe antidepressant medication at that time.  (AR 266)

On October 12, 2004, Bergstrom returned to Dr. Wingert, who noted that the ordered tests were unrevealing.  Bergstrom reported that Celebrex had worked for him, and Dr. Wingert gave him samples.  Dr. Wingert also signed Bergstrom up with the Patient Medication Assistance Program.  (AR 264)

On November 15 and 28, 2004, and December 1, 2004, Judith Simpson Neighbours, Ph.D., examined Bergstrom at the request of the Commissioner.  (AR 254-57)  Bergstrom mentioned that he was not taking his prescribed antidepressant medication due to lack of money, although he was taking prescribed medication for his joints.  (AR 254)  Mental status examination findings were consistent with depression and below average intelligence.  Dr. Neighbours estimated Bergstrom's GAF at 47, or serious symptoms.  (AR 257)

On December 6, 2004, Dave R. Johnson, M.D., examined Bergstrom at the Commissioner's request.  (AR 259-61)  Dr. Johnson found fairly good neck and spinal range of motion, no signs of arthritis or joint swelling,

negative McMurray and drawer signs of both knees, and intact collateral ligaments. (AR 206)  Neurological examination was normal, as was a left knee X-ray, except for "some very slight degenerative changes noted on the patella."  Johnson did not recommend any permanent limitations.  (AR 261)

On December 8, 2004, Jerry Buchkoski, Ph.D., completed mental RFC and psychiatric review technique forms at the Commissioner's request.  (AR 199-217)  Buchkoski found that Bergstrom's severe mental impairments resulted in moderate limitations in his abilities to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods and respond appropriately to changes at work.  (AR 199-200)  He further noted that "[e]motional concerns are not that significant of an impairment at this time and do not preclude work."  (AR 201)

Bergstrom testified that he had last worked in 2004 for his landlord "putting roofs on houses and stuff."  (AR 466)  He left that job for a better-paying one, but he injured himself the first day on his new job and "couldn't walk for about two months afterward" due to sore feet.  (AR 467)  Bergstrom also testified that he had problems with swelling and pain of his feet and knees "[a]ll the time" for several years.  (AR 467, 469, 473-74)  Bergstrom's record does not indicate employment as of July 28, 2004.  (AR 93)

Bergstrom visited Dr. Wingert again on February 3, 2005, primarily complaining of depression.  Dr. Wingert noted that Bergstrom did not appear

8

in any distress and physical findings were normal.  Dr. Wingert prescribed
antidepressant medication and gave Bergstrom a five-week supply.  (AR 263)

On March 2, 2005, Dr. Gunn again reviewed Bergstrom's records at the
Commissioner's request, and he concurred with Dr. Buchkoski's opinion that
despite having severe mental impairments, Bergstrom retained the mental
ability to work.  (AR 201, 204)

On May 3, 2005, in preparation for the ALJ hearing, Bergstrom's
attorney requested an updated consultative evaluation regarding Bergstrom's
learning difficulties and depression.  The Commissioner did not respond.  (AR
163)

Dr. Wingert discussed Bergstrom's work limitations on October 13,
2005.  In Dr. Wingert's opinion, Bergstrom needed light duty physical
requirements and a mentally non-demanding job.  Also, he opined that
Bergstrom should not work in an outside environment with temperature
changes.  Appropriate positions included working in the photo department at
Wal-Mart, as a cashier, or in fast-food services.  (AR 286)

On July 22, 2005, Bergstrom's attorney again requested an updated
consultative evaluation, which went unanswered.  (AR 64)

On December 12, 2005, John J. Lassegard, M.D., of the Rapid City
Community Health Center, examined Bergstrom.  Bergstrom was out of
medication and complained of left knee pain.  Examination revealed

exacerbation of left knee arthritis, and Lassegard re-prescribed medication. (AR 285)  The following day, Dr. Wingert aspirated and injected the left knee. (AR 284)

In February of 2006, Bergstrom's attorney renewed the request for a consultative evaluation at the hearing.  The ALJ denied the request on grounds that sufficient evidence existed for him to issue a decision.  (AR 497)

Bergstrom testified at the hearing that depression made him feel "half sick to [his] stomach" and nervous; it caused him to pull out his hair and affected his memory, concentration, and emotions.  (AR 471-72)  The record does not indicate that Bergstrom sought treatment for depression after December 2005.  At the hearing, Bergstrom attributed his failure to seek treatment to inability to pay.  (AR 467-70, 475-76)  Bergstrom testified that he was on "quite a few" medications for arthritis and afforded them "through a patient's assistance program through the Rapid City Community Health." (AR 476)  Bergstrom further testified that he could sit for three to four hours at a time; stand for one hour at a time up to four to five hours a day; and walk for one and one-half hours at a time up to two hours total during a day. (AR 480)  He estimated that he could lift and carry twenty-five to thirty pounds, but not continuously.  (AR 483)  He reported that he could not straighten his leg, squat, kneel, or easily climb stairs.  (AR 483-85)

10

Bergstrom, however, could wash dishes and clothes; vacuum; take out the garbage; and visit a neighbor, his girlfriend, and his parents.  (AR 479)

At the hearing, independent psychological medical expert Thomas Atkin, Psy.D., testified that Bergstrom's severe mental impairments resulted in moderate limitations in understanding, remembering, and executing complex instructions.  (AR 289)  Bergstrom also had trouble interacting appropriately with the public, supervisors, and co-workers, as well as responding appropriately to usual work situations and changes in a routine work setting.  (AR 304)  Dr. Atkin further testified that medical records showed Bergstrom's failure to follow recommended treatment, including antidepressants and therapy, and that when properly treated, his mental health problems improved dramatically.  (AR 457, 459-60)  Although Dr. Neighbours had indicated a low GAF, she did not indicate that Bergstrom could not execute simple tasks, or retain, remember, and complete simple directions.  (AR 457-58)  In Dr. Atkin's opinion, a GAF was highly subjective and "not a good indicator of how the individual is functioning purely on a psychological level."  (AR 461)  Dr. Atkin additionally noted that lack of money was an additional stressor that could impact Bergstrom's depression. (AR 460)

William Tysdal, C.R.C., a vocational expert, also testified at the hearing. (AR 487-96)  The ALJ asked the vocational expert to consider "a younger

11

individual with a high school education that was mostly Special Ed." (AR 489)  According to Tysdal, if the individual were limited to light and medium work, and possessed the limitations described by Dr. Atkin, the individual could not perform Bergstrom's past relevant work, but could perform work as a small products assembler and electronics worker.  (AR 303-305; 489)  Additionally, 225,000 of these jobs existed in the national economy, with 5,000 in the regional economy.  (AR 490)  Tysdal testified that his answer would remain the same if the individual could not make change or had problems understanding what he had read in a newspaper or in social security documents.  (AR 490-91)  If the individual were limited to sedentary work, Tysdal continued that he could perform the jobs of final assembler and jewelry painter, with 40,000 and 900 of these jobs existing in the national and regional economies, respectively.  (AR 491)

Finally, on June 29, 2006, Lori Linco, a vocational rehabilitation counselor from the Division of Rehabilitation Services, testified that Bergstrom had been receiving medical care through Rapid City Community Healthcare because he did not have health insurance, but that she did not have all of Bergstrom's medical records.  In her opinion, Bergstrom had chronic pain, depression, and impairments of the extremities and cognition. Acknowledging that she was not a psychologist, Linco opined that Bergstrom's depression had worsened and was impacting cognition.  (AR 174)

Employment sought for Bergstrom included work as a light assembly or light service worker, and limitations included those Bergstrom had set upon himself.  (AR 176, 184)  The only limitations culled from a physician's report were Dr. Stearns', which stated that due to left knee problems, Bergstrom had unspecified limitations on lifting, working at unprotected heights, squatting, and working on roofs or ladders.  (AR 189)

## ALJ DECISION

Bergstrom applied for disability insurance benefits and supplemental security income on August 10, 2004, which alleged disability since April 1, 2002.  The claim was denied initially, and a request for hearing was timely filed.  The ALJ ruled against Bergstrom in a written decision dated September 25, 2006.  Bergstrom's date of last insured is March 31, 2005.

After applying the sequential five-step evaluation process,[2] the ALJ concluded that Bergstrom was not entitled to benefits.  First, the ALJ

---

[2] The five-step sequential analysis as outlined by the Eighth Circuit follows: (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform. Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

determined that although Bergstrom had worked after his alleged onset date at what appeared to be substantial work activity and what appeared to involve extensive unreported earnings, Bergstrom's reported earnings did not qualify as substantial gainful activity.  Second, the ALJ determined that Bergstrom's arthralgias, depression, and borderline intellectual functioning amounted to severe impairments under Social Security Regulations.  Third, the ALJ found that the severity of Bergstrom's impairments did not meet or equal a Medical Listing.

Next, the ALJ examined Bergstrom's RFC.  In assessing Bergstrom's subjective complaints of pain, the ALJ considered the Polaski factors, such as Bergstrom's daily activities; the location, duration, frequency, and intensity of pain; and factors concerning functional limitations and restrictions due to pain or other symptoms produced by the medically determinable impairments.  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  The ALJ did not find Bergstrom credible in light of the medical evidence and discrepancies between Bergstrom's assertions and the documentary reports. Bergstrom's extensive work activity after the alleged onset date included doing carpentry work 40 hours per week from February 2001 to January 2003, and from May 2003 to June 2003, as well as logging five days per week from June 2003 to June 2004.  Moreover, although Bergstrom claimed inability to work due to pain, the record revealed infrequent trips to the

14

doctor for the allegedly disabling symptoms, significant gaps in his history of treatment, and essentially routine and conservative treatment.  Bergstrom received no medical treatment from December 2005 through February 2006, and Bergstrom offered no evidence that providers refused to provide Bergstrom medical treatment due to financial reasons, or that he had sought existing sliding scale fee services.  Despite alleged inability to afford medical treatment, Bergstrom nonetheless obtained counseling services for relationship issues with his girlfriend.  The ALJ determined Bergstrom's RFC to be at a medium to light exertional level, with mild to moderate limitations in understanding, remembering, and executing complex instructions; making judgments on complex work-related decisions; and responding appropriately to work situations.  The ALJ's findings were generally consistent with the opinions of Bergstrom's treating physicians, Bergstrom's testimony regarding his physical functioning, and opinions of an independent psychological medical expert.  (AR 25-27)

Finally, the ALJ found that although Bergstrom could not perform his past relevant work as a logger or carpenter, he could perform other jobs existing in significant numbers in the national economy that were consistent with his RFC, age, education, and work experience.  According to the vocational expert's testimony at the hearing, these jobs included work as an

assembler of small products, electronics worker, or final assembler.  Thus, the ALJ held that Bergstrom was not disabled.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if substantial evidence in the record supports it as a whole.  42 U.S.C. § 405(g); Metz v. Shalala, 49 F.3d 374, 376 (8th Cir. 1995).  Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion.  Fines v. Apfel, 149 F.3d 893 (8th Cir. 1998); Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971).  Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.  Brockman v. Sullivan, 987 F.2d 1344, 1346 (8th Cir. 1993); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); Turley v. Sullivan, 939 F.2d 524, 528 (8th Cir. 1991).

Under section 405(g), the court is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to reweigh the evidence or try the issues de novo. Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because

16

substantial evidence would have supported an opposite decision." <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993).  <u>See also</u> <u>Smith v. Shalala</u>, 987 F.2d at 1374.  The court must review the Commissioner's decision to determine if an error of law has been committed.  <u>Smith v. Sullivan</u>, 982 F.2d 308, 311 (8th Cir. 1992); <u>Nettles v. Schweiker</u>, 714 F.2d 833, 836 (8th Cir. 1983).  The Commissioner's conclusions of law are only persuasive, not binding, on the reviewing court.  <u>Smith v. Sullivan</u>, 982 F.2d at 311; <u>Satterfield v. Mathews</u>, 483 F. Supp. 20, 22 (E.D. Ark. 1979), <u>aff'd per curiam</u>, 615 F.2d 1288, 1289 (8th Cir. 1980).  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  <u>Smith v. Shalala</u>, 987 F.2d at 1374.

## DISCUSSION

### A.    Basis in Record Evidence for the ALJ's Decision

Bergstrom argues that the ALJ did not develop the record fully and fairly when he denied another consultative examination to evaluate Bergstrom's allegedly worsening depression.  The ALJ, however, may issue a decision without obtaining additional medical evidence, if other evidence in the record provides sufficient basis for making an informed decision.  <u>See, e.g.</u>, <u>Haley v. Massanari</u>, 258 F.3d 742, 749-50 (8th Cir. 2001); <u>Conley v. Bowen</u>, 781 F.2d 143, 146 (8th Cir. 1986).  In <u>Haley</u>, the court held that the

17

ALJ was not required to send claimant for further consultative examination before rejecting his claim for disability insurance benefits, because the record contained numerous medical reports from treating physicians, consulting physicians, and psychologists spanning a six-year period.  Haley, 258 F.3d at 749.  The record also included disability reports, supplemental disability outlines, questionnaires completed by claimant, and the ALJ hearing transcripts in which claimant was questioned by both the ALJ and his attorney.  Id.  Similarly, Bergstrom's record included medical reports addressing his depression from 2002 through 2006, from Drs. Bergstrom, Groeger, Wingert, Neighbours, Johnson, Lassegard, and medical expert Dr. Atkin.  His record also contained a questionnaire completed by Bergstrom, disability reports, and a transcript of the ALJ hearing in which both the ALJ and counsel questioned Bergstrom about his depression and its impact on his daily activities.  (AR 347, 333, 337, 475)  In reaching his decision to deny another consultative examination, the ALJ considered a sufficient panoply of reports addressing Bergstrom's depressive condition.

**B.    Inability to Afford Treatment for Worsening Depression**

Bergstrom attributes the lack of medical reports regarding his depression after December of 2005 to his inability to afford treatment.  Furthermore, he argues that his financial hardship supports a finding that the assessment of independent psychological medical expert Dr. Atkin does

18

not constitute substantial evidence of non-disabling depression.  The government counters that where Bergstrom has neither sought treatment for worsening depression, nor shown that he was deprived of medical services due to financial reasons, Dr. Atkin's opinion constitutes substantial evidence of non-disabling depression, and the ALJ developed the record regarding depression fully and fairly.

Although Bergstrom draws upon case law holding that lack of sufficient financial resources to follow medical treatment directives for disabling impairments may excuse non-compliance,[3] he cannot fault the ALJ for not developing the record fully and fairly when he has not sought treatment for an allegedly worsening ailment.  See Murphy v. Sullivan, 953 F.2d 383, 386-7 (8th Cir. 1992).  In Murphy, the court affirmed the ALJ's determination that claimant's financial hardship was not severe enough to justify failure to seek medical treatment, because claimant did not provide evidence of seeking low-cost medical treatment from her doctor, clinic, and hospitals.  Id.  Similarly, Bergstrom did not provide evidence that he sought treatment for depression between December 2005 and February 2006.  Nor did he show that medical providers withheld treatment for depression due to financial reasons.  Bergstrom testified that the Rapid City Community Health office at Sturgis

---

[3] See, e.g., Tome v. Schweiker, 724 F.2d 711, 714 (8th Cir. 1984); Sharp v. Bowen, 705 F. Supp. 1111, 1124 (W.D. Pa. 1989).

once turned him away for arthritis treatment because he lacked insurance. (AR 469)  Bergstrom, however, received "quite a few" medications for arthritis, and "a patient's assistance program through the Rapid City Regional Clinic" paid for most of them.  (AR 476)  Furthermore, the record does not show that Bergstrom sought treatment for depression from Community Health after December 2005, or from Behavior Management Systems (BMS) and the Department of Human Services, Division of Mental Health.  (AR 26)  As the ALJ observed, BMS offered a sliding scale fee schedule, and the Division of Mental Health provided free services for claimants who met eligibility requirements.  Id.

Moreover, the court distinguishes Tome and Sharp, Bergstrom's cited cases, on other grounds.  First, the medical reports in Tome actually corroborate claimant's complained ailments, 724 F.2d at 713, whereas Bergstrom's records as a whole fail to reflect a worsening depressive condition.  Second, Bergstrom has not refused treatment justifiably in light of psychological, social, or other individual circumstances.  Id.; Sharp, 705 F. Supp. at 1124.  In Tome, the court found that claimant's failure to follow prescribed treatment did not render her ineligible for benefits, because claimant's self-discipline and eighth-grade education were insufficient for understanding and following a strict dietary and insulin regimen.  Tome, 724 F.2d at 712-13.  In Sharp, the court adopted similar reasoning, where

20

claimant's severe personality disorder prevented her from cooperating with treatment.  Sharp, 705 F. Supp. at 1124.  By contrast, Bergstrom, who is high-school educated, consciously decided not to follow prescribed treatment for depression; he acknowledged that his medication "helps a little" but "doesn't justify for what it costs" at the ALJ hearing.  (AR 470)  Bergstrom did not refuse treatment justifiably, and Dr. Atkin's assessment constitutes substantial evidence of non-disabling depression.

Finally, Bergstrom obtained services for alternate issues, namely arthritis and relationship problems.  This fact discredits his alleged inability to afford treatment for worsening depression.  See Siemers v. Shalala, 47 F.3d 299, 301 (8th Cir. 1995).  In Siemers, the court discredited claimant's testimony that she did not seek treatment for low back pain or depression due to cost, because she sought treatment for gynecological problems, a sore throat, headaches, a persistent cold, foot problems, and prescriptions for diet pills.  Id.  Similar to the claimant in Siemers, Bergstrom had sought treatment for arthritis, as well as counseling for relationship troubles with his girlfriend.  (AR 226)  That Bergstrom spent $100 per month on cigarettes further discredited his inability to seek treatment due to cost.  Id.  The ALJ properly found these expenditures inconsistent with Bergstrom's alleged inability to afford treatment for worsening depression.

21

Accordingly, the court finds that the ALJ did not err in considering Bergstrom's failure to seek treatment due to financial constraints as support for his finding of non-disabling depression.

**C.     Opinion of Bergstrom's Rehabilitation Counselor**

Bergstrom relies on the statement of Lori Linco, his rehabilitation counselor, to support his claim of disabling depression.[4]  The court, however, does not grant controlling weight to Linco's statement, for her lay opinion contradicts other medical evidence as a whole in the record.  See Snead v. Barnhart, 360 F.3d 834, 837 (8th Cir. 2004); Prosch v. Apfel, 201 F.3d 1010, 1014 (8th Cir. 2000).  In Snead, the court held that the ALJ did not develop the record sufficiently, because the claimant's letter from his internist describing his severe heart condition did not contradict other medical evidence in the record.  Snead, 360 F.3d at 837-8.  By contrast, the court in Prosch did not abide by the opinion of claimant's treating physician, because his opinion contradicted other substantial medical evidence.  Prosch, 201 F.3d at 1014.  More like that of claimant's doctor in Prosch than Snead, Linco's statement contradicts Bergstrom's sporadic mental health treatment in the past, the absence of medical treatment between December 2005 and February 2006, and the testimony of independent psychological medical

---

[4] Linco wrote in July 2006, "I am not a licensed psychologist, but it has been my observation over the last year or two that [Bergstrom's] depression has worsened and is further impacting his cognitive abilities."  (AR 174)

expert Dr. Atkin.[5]  Bergstrom last complained of depression in February

2005, and Dr. Wingert gave Bergstrom a five-week supply of antidepressant

medication.[6]  (AR 263)  In October of 2005, Dr. Wingert assessed that

Bergstrom could perform light and mentally non-demanding jobs.  (AR 286)

When Bergstrom visited the Community Health Center most recently in

December 2005, he did not raise concerns about depression to either

Drs. Wingert or Lassegard.  (AR 284-5)  Thus, the ALJ properly found that

Linco's opinion did not require another psychological consultative evaluation.

**D.     Nature of the ALJ Hearing**

The nature of the ALJ hearing supports the ALJ's finding.  See Battles

v. Shalala, 36 F.3d 43, 45 (8th Cir. 1994).  In Battles, the court held that the

ALJ did not develop the record fully and fairly where the ALJ hearing lasted a

mere ten minutes, was transcribed in eleven pages, and questions from the

ALJ and counsel did not address claimant's mental capacity to work, because

the elicited information could not portray accurately the extent of claimant's

limitations.  Id.  During Bergstrom's hearing, the ALJ questioned Bergstrom

---

[5] In February of 2006, Dr. Atkin assessed that Bergstrom's failure to follow through with recommended treatment for depression caused Bergstrom's worsened functioning and lower intellectual abilities.  (AR 301)  Nonetheless, these limitations hit only moderate levels.  Id.

[6] See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) (finding the fact that claimant had been prescribed antidepressants on at least one occasion is not enough to require the ALJ to order a psychological evaluation).

about the impact of depression on his functioning and the effects of
Bergstrom's arthritis on his mood and emotions.  (AR 471, 475)  In addition,
counsel asked Bergstrom if there was anything else he wanted to tell or
explain to the ALJ regarding why he could not return to work, which
prompted Bergstrom to comment again on his depression.  (AR 486)  Where
the transcript of the hearing spans forty-four pages, and both the ALJ and
counsel questioned Bergstrom about his depression and its impact on mental
capacity, the court finds that the ALJ developed Bergstrom's record fully and
fairly.

## CONCLUSION

Substantial evidence supports the ALJ's conclusion.  The ALJ
developed Bergstrom's record regarding depression fully and fairly, because
(1) the ALJ relied on sufficient medical evidence in Bergstrom's record to
reach his decision; (2) Bergstrom failed to prove inability to afford treatment
for worsening depression; (3) Linco's lay opinion, which conflicted with
medical evidence as a whole in the record, does not prompt consultative
examination; and (4) the ALJ and Bergstrom's counsel properly addressed
Bergstrom's mental capacity to work at the hearing.  Although medical
evidence indicates that Bergstrom suffers from depression, he is nonetheless
capable of performing light and mentally non-demanding jobs.  Thus, the ALJ

correctly denied Bergstrom disability insurance benefits and supplemental security income.

Accordingly, it is hereby

ORDERED that the Commissioner of Social Security's decision denying Thomas Bergstrom's claim for disability insurance benefits and supplemental security income under Titles II and XVI of the Social Security Act is affirmed.

Dated June 25, 2008.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE